[Cite as *Acuity v. Masters Pharmaceutical, Inc.*, 2020-Ohio-3440.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| ACUITY, | : | APPEAL NO. C-190176 |
| | | TRIAL NO.  A-1701985 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| MASTERS PHARMACEUTICAL, INC., | : | |
| Defendant-Appellant. | : | |


Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal:  June 24, 2020

*Gallagher Sharp* and *Gary L. Nicholson*, and *Dean & Fulkerson, P.C.,* and *Karen Libertiny Ludden*, for Plaintiff-Appellee,

*Garvey Shearer Nordstrom, P.S.C.,* and *Jennifer K. Nordstrom,* and *Brouse McDowell, Paul A. Rose* and *Amanda M. Leffler*, for Defendant-Appellant,

*Weston Hurd L.L.P.* and *Gary W. Johnson,* for Amicus Curiae Complex Insurance Claims Litigation Association and American Casualty Insurance Association,

*Reed Smith L.L.P.* and *Jason E. Hazelwood,* for Amicus Curiae United Policyholders.

**CROUSE, Judge.**

{¶1} This case concerns an insurance company's duty to defend and indemnify an insured pharmaceutical distributor in lawsuits brought by governmental entities for costs incurred combating the opioid epidemic.

{¶2} Defendant-appellant Masters Pharmaceutical, Inc., ("MPI") was a pharmaceutical wholesale distributor with its principal place of business in Hamilton County, Ohio. As part of its business, MPI would fill and ship orders of prescription opioids to pharmacies around the country. "Opioids" refers to a class of prescription drugs primarily used to treat pain. Opioids can be highly addictive, a trait which has contributed to hundreds of thousands of drug-overdose deaths in the United States, in what is now commonly referred to as the "opioid epidemic."[1] MPI has been sued by various cities and counties ("governmental entities") from three different states—West Virginia, Michigan, and Nevada—for costs incurred combating the opioid epidemic (the "underlying suits"). At the time the underlying suits were filed, MPI was insured by plaintiff-appellee Acuity under eight commercial general liability ("CGL") policies. The insurance policies imposed upon Acuity, under certain circumstances, a duty to defend MPI against lawsuits, and to indemnify MPI for damages it may be legally obligated to pay as a result.

{¶3} The majority of the underlying suits were transferred to a federal multidistrict litigation (MDL) court in the Northern District of Ohio as part of the "National Prescription Opioid" litigation. In the underlying suits, the governmental entities allege that MPI acted negligently in failing to investigate, report, and refuse

[1]Centers for Disease Control and Prevention, *Understanding the Epidemic*, https://www.cdc.gov/drugoverdose/epidemic/index.html (accessed May 28, 2020).

to fill suspicious orders of prescription opioids, thereby failing to maintain effective controls against the diversion of prescription opioids into "other than legitimate medical, scientific, and industrial channels" in violation of federal and state laws. They claim that MPI's violations contributed to the opioid epidemic, resulting in damages that included increased costs to the governmental entities for increased police patrols, judicial expenditures, prison and public-works expenditures, substance-abuse treatment, and emergency and medical-care services.

{¶4}   Acuity sought a declaration that it does not have a duty to defend or indemnify in the underlying suits.   Both parties filed motions for summary judgment.   The trial court granted Acuity's motion for summary judgment and declared that Acuity does not owe MPI a duty to defend or indemnify it in the underlying suits.   MPI has appealed, and argues in two assignments of error that the trial court erred in denying its motion for summary judgment and granting Acuity's motion for summary judgment.   MPI's first assignment of error states that the trial court erred in determining that Acuity has no duty to defend in the underlying suits. MPI's second assignment of error states that the trial court erred in determining that Acuity has no duty to indemnify it against future opioid settlements or judgments.

{¶5}   For the following reasons, we sustain MPI's assignments of error and reverse the trial court's decision granting summary judgment in favor of Acuity and denying MPI's motion for summary judgment.

### Standard of Review

{¶6}   A trial court's grant of summary judgment is reviewed de novo. *Amankwah v. Liberty Mut. Ins. Co.,* 2016-Ohio-1321, 62 N.E.3d 814, ¶ 9 (1st Dist.).

Summary judgment is proper under Civ.R. 56(C) when no genuine issues as to any material fact remain; the moving party is entitled to judgment as a matter of law; and it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party.

*Id.* The parties agree that there are no material facts in dispute, and that a declaratory judgment is appropriate in this case. We are thus presented only with a question of law concerning the correct construction of the insurance policies. *See Westfield Ins. Co. v. Factfinder Marketing Research, Inc.,* 168 Ohio App.3d 391, 2006-Ohio-4380, 860 N.E.2d 145, ¶ 14 (1st Dist.).

### *The Language of the Policies*

{¶7} MPI purchased eight insurance policies from Acuity between July 2010 and July 2018. As is relevant to this case, the language in all eight policies is substantially the same. The policies state that:

[Acuity] will pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies. [Acuity] will have the right and duty to defend the insured against any suit seeking those damages. However, [Acuity] will have no duty to defend [MPI] against any suit seeking damages for bodily injury or property damage to which this insurance does not apply.

{¶8} "Bodily injury" is defined as "bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time." The policies do not define "damages," but do state that damages because of bodily injury

4

include damages "claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury."

### First Assignment of Error

{¶9} In its first assignment of error, MPI argues that the trial court erred in ruling that Acuity has no duty to defend MPI against the underlying suits.

{¶10} In its ruling, the trial court found that the issues in this declaratory-judgment action are the very same issues decided in *Westfield Ins. Co. v. Masters Pharmaceutical Inc.,* Hamilton C.P. No. A1401036 (Dec. 17, 2015) ("2015 Decision"). In *Westfield*, the court granted a declaratory judgment in favor of Acuity and found that Acuity had no duty to defend MPI against a lawsuit filed against it by the state of West Virginia in 2015. The court held that Acuity had no duty to defend because the state of West Virginia only asserted claims for its own economic loss, and not for bodily injury, and because MPI failed to show that it did not know of any bodily injury prior to the policy period.[2]

{¶11} Applying the same rationale as the 2015 Decision, the trial court cited two reasons in support of its decision that Acuity had no duty to defend: (1) "because of bodily injury" did not include the claims brought by the governmental entities, and (2) MPI filled suspicious orders before Acuity insured MPI, and MPI knew then of the addiction to prescription opioids, invoking the loss-in-progress provision. Although Acuity also requested summary judgment based on the doctrine of res judicata due to the 2015 Decision, the trial court did not grant summary judgment on that basis.

---

[2] The state of West Virginia's lawsuit was ultimately settled, and an appeal of the 2015 declaratory-judgment decision of the Hamilton County Court of Common Pleas was dismissed.

### *Res Judicata*

**{¶12}** Acuity devotes one paragraph of its 35-page brief to the argument that MPI's claims are barred by res judicata, an argument it raised before the trial court, but upon which the trial court made no ruling. In Ohio, the doctrine of res judicata encompasses the two related concepts of claim preclusion, also known as res judicata, and issue preclusion, also known as collateral estoppel. *State ex rel. Schachter v. Ohio Pub. Emps. Retirement Bd.,* 121 Ohio St.3d 526, 2009-Ohio-1704, 905 N.E.2d 1210, ¶ 27. Acuity contends that claim preclusion applies in this case.

> Claim preclusion prevents subsequent actions, by the same parties or their privies, based upon any claim arising out of a transaction that was the subject matter of a previous action. The previous action is conclusive for all claims that were or that could have been litigated in the first action.

(Citation omitted.) *Id.*

**{¶13}** Acuity points to the 2015 Decision, holding that Acuity had no duty to defend West Virginia's 2015 lawsuit against MPI, as the previous action that bars consideration of MPI's claims in the present case. We disagree. There is nothing in the record to establish that the transactions that formed the subject matter of the underlying suits brought by the governmental entities in Michigan, Nevada, and West Virginia are the same as the transactions that formed the subject matter of the 2015 suit brought by the state of West Virginia. There is also nothing in the record to suggest that the claims in the underlying suits could have been litigated as part of the 2015 case. Therefore, claim preclusion does not apply.

### *Because of Bodily Injury*

{¶14}  We now turn to the meaning of the "because of bodily injury" provision in the policies.  In resolving questions regarding a duty to defend, there is a strong presumption in favor of the insured.  *City of Willoughby Hills v. Cincinnati Ins. Co.,* 9 Ohio St.3d 177, 180, 459 N.E.2d 555 (1984).

> Where the insurer's duty to defend is not apparent from the pleadings in
> the case against the insured, but the allegations do state a claim which is
> potentially or arguably within the policy coverage, or there is some doubt
> as to whether a theory of recovery within the policy coverage had been
> pleaded, the insurer must accept the defense of the claim.

*Id.*;  *Chiquita Brands Internatl., Inc. v. Natl. Union Ins. Co.,* 2013-Ohio-759, 988 N.E.2d 897, ¶ 8 (1st Dist.).  A duty to defend attaches unless the conduct alleged is indisputably outside the scope of coverage.  *Chiquita* at ¶ 9.  "Once an insurer must defend one claim within a complaint, it must defend the insured on all the other claims within the complaint, even if they bear no relation to the insurance policy coverage."  *Sharonville v. Am. Emps. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, ¶ 13, citing *Preferred Mut. Ins. Co. v. Thompson* 23 Ohio St.3d 78, 80, 491 N.E.2d 688 (1986).  "To defeat coverage, the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation *is the only one* that can fairly be placed on the language in question." (Emphasis added.)  *Andersen v. Highland House Co.,* 93 Ohio St.3d 547, 549, 757 N.E.2d 329 (2001).

{¶15} Neither party disputes that physical harm from opioid addiction constitutes bodily injury under the policies.  However, the plaintiffs in the underlying

suits are governmental entities, not the individuals who suffered from opioid addiction. The trial court determined that the underlying suits do not state a claim that is "potentially or arguably within the policy coverage" because the governmental entities are not seeking damages "because of bodily injury." Rather, the court determined that they are seeking damages for economic losses caused by MPI's failure to prevent the diversion of opioids.

{¶16} Several courts have interpreted the phrase "because of" broadly as it relates to insurance policies. *See, e.g., Medmarc Cas. Ins. Co. v. Avent Am., Inc.,* 612 F.3d 607, 616 (7th Cir.2010) ("because of bodily injury" is interpreted more broadly than "for bodily injury"); *Federated Mut. Ins. Co. v. Concrete Units, Inc.,* 363 N.W.2d 751, 757 (Minn.1985) ("we conclude that the most sensible reading of the underscored phrase, 'damages because of * * * property damage,' requires the insurer to pay all damages which are causally related to an item of 'property damage.' ").

{¶17} Under the policies, "damages" includes damages "claimed by any person or *organization* for care, loss of services or death resulting at any time from the bodily injury." (Emphasis added.) Thus, the policies expressly provide for a defense where organizations claim economic damages, as long as the damages occurred because of bodily injury.

{¶18} The Seventh Circuit's decision in *Cincinnati Ins. Co. v. H.D. Smith, L.L.C.,* 829 F.3d 771 (7th Cir.2016) is one of the most recent and persuasive decisions on the matter. In that case, the court interpreted language in a CGL policy that is identical to the language at issue here. The insurer was required to defend against suits that alleged " 'damages because of bodily injury,' including 'damages claimed by

8

any person or organization for care, loss of services or death resulting at any time from the bodily injury.' " *Id.* at 773. The state of West Virginia sued the insured pharmaceutical company for money spent addressing the opioid epidemic. *Id.* at 775. In an attempt to avoid its duty to defend, the insurer advanced an argument identical to Acuity's argument in the present case—that the government was seeking its own damages, not damages on behalf of its citizens, and so the damages were not "because of bodily injury." *Id.* at 774.

{¶19} In its opinion, the court noted an example discussed during oral argument that illustrated why the insurer's argument was unpersuasive:

> Suppose a West Virginian suffers bodily injury due to his drug addiction and sues H.D. Smith for negligence. Cincinnati's counsel acknowledged that such a suit would be covered by its policy. Now suppose that the injured citizen's mother spent her own money to care for her son's injuries. Cincinnati's counsel acknowledged that her suit would be covered too—remember the policy covers "damages claimed by any person or organization for care … resulting … from the bodily injury."
> The mother's suit is covered even though she seeks *her own* damages (the money she spent to care for her son), not damages on behalf of her son (such as his pain and suffering or money he lost because he missed work). Legally, the result is no different merely because the plaintiff is a state instead of a mother.

*Id.* The court held that "because of bodily injury" included claims brought by governmental entities to recover damages sustained due to the opioid epidemic, and so the insurer had a duty to defend against the underlying suit. *Id.* at 775.

{¶20} The court made clear that while West Virginia alleged numerous legal theories and sought a variety of remedies in its complaint, "the duty to defend arises 'even if only one of several theories is within the potential coverage of the policy.' " *Id.* In the complaint, West Virginia alleged that it "incurred excessive costs related to diagnosis, treatment and cure of addiction," and has "provide[d] necessary medical care, facilities, and services for treatment of citizens who cannot afford their own care." *Id.* West Virginia sought "reimbursement for such 'damages and losses sustained as a proximate result' of H.D. Smith's negligence." *Id.* The court found that those allegations were sufficient to trigger Cincinnati's duty to defend. *Id.*

{¶21} Although not an opioid case, the District of Maryland addressed a similar issue in *Beretta U.S.A. Corp. v. Fed. Ins. Co.,* 117 F.Supp.2d 489 (D.Md.2000), *aff'd,* 17 Fed.Appx. 250 (4th Cir.2001). The CGL policies covered "damages because of bodily injury," to include "damages claimed by any person or organization for care, loss of services, or death resulting at any time from the bodily injury." *Id.* at 496. The court held that the governmental entities' lawsuits for costs spent providing medical care and emergency services in response to violence caused by the insured's firearms invoked the insurer's duty to defend. *Id.*

{¶22} *H.D. Smith* and *Beretta* applied Illinois and Maryland law, respectively, but they comport with Ohio law.

{¶23} The trial court in this case followed the rationale set forth in the 2015 Decision in finding that Acuity has no duty to defend. The problem is, the 2015 Decision is based on a web of case law that is either no longer good law, has been distinguished as relating to opioid cases, or has been declined to be followed.

{¶24} The 2015 Decision was based in part on the district court's ruling in *H.D. Smith,* which, as discussed above, was reversed by the Seventh Circuit. Also, the 2015 Decision relied on *Cincinnati Ins. Co. v. Richie Ents. LLC*, W.D.Ky. No. 1:12-CV-00186-JHM, 2014 WL 3513211, *5 (July 16, 2014). In *Richie,* the court held that the underlying suit by the state of West Virginia against the pharmaceutical company did not seek damages "because of bodily injury," but instead sought damages for West Virginia's own economic losses sustained combating the opioid epidemic, and so the insurer had no duty to defend. *Id.* However, *Richie* relied on a Seventh Circuit case, *Medmarc Cas. Ins. Co.,* 612 F.3d at 616, which was subsequently distinguished by *H.D. Smith.* In *MedMarc,* there was no claim of bodily injury in any form, much less bodily injury as a result of the insured's conduct, and *MedMarc* concerned coverage "for bodily injury" and not "because of bodily injury." *H.D. Smith,* 829 F.3d at 774-775.

{¶25} The 2015 Decision also cited *Travelers Property Cas. Co. of Am. v. Anda, Inc.*, 90 F.Supp.3d 1308 (S.D.Fla.2015), *aff'd*, 658 Fed.Appx. 955 (11th Cir.2016). In *Travelers,* the court held that the state of West Virginia asserted "claims only for its own economic loss and not 'for bodily injury.' It does not purport to assert claims on behalf of individual citizens for the physical harm sustained personally by those citizens, for instance." *Id.* at 1314. But, the *Travelers* court relied upon the *Richie* court's analysis. Also, although the Eleventh Circuit affirmed the district court's decision, it expressly declined to address the "because of bodily injury" issue. *Travelers Prop. Cas. Co. of Am. v. Anda, Inc.*, 658 Fed.Appx. 955, 958 (11th Cir.2016).

11

{¶26} Acuity cites to *Cincinnati Ins. Co. v. Anders*, 99 Ohio St.3d 156, 2003-Ohio-3048, 789 N.E.2d 1094, for the proposition that the economic damages claimed by the governmental entities in the underlying case are outside the scope of the policy's coverage. In *Anders*, the property owners sued the sellers of their home for failing to disclose certain defects in the home. *Id.* at ¶ 2. The property damage at issue on appeal was "allegedly caused by installation of fiberglass insulation with the vapor barrier on the wrong side, leading to the eventual deterioration of the floor joists." *Id.* The policies required that the property damage must "arise out of an occurrence, that is, an accident resulting in property damage," in order for coverage to apply. *Id.* at ¶ 35. The property damage was alleged to have been caused by the faulty installation of insulation in the house sold to the plaintiffs. *Id.* The claims in the underlying suit pertained to the insured's *nondisclosure* of the faulty installation of the insulation, not the faulty installation itself. (Emphasis added.) *Id.* at ¶ 36. The court held that "the occurrence for the purposes of the policy was not the nondisclosure of the damage." *Id.* at ¶ 35. Since the occurrence resulting in property damage was the faulty installation, the claims alleging nondisclosure were outside the scope of coverage. *Id.* at ¶ 36. The court thus excluded coverage because there was no causal connection between the conduct of the insured (failing to disclose the damage) and the property damage (the structural deterioration of the house). *Id.* at ¶ 35-36.

{¶27} In this case, the policies at issue require the bodily injury to be "caused by an occurrence" and that the damages are "because of bodily injury." Acuity contends that the "occurrence" for the purposes of the policies is the alleged negligent distribution of prescription opioids by MPI. Acuity argues that like the

*Anders* case, there is a "mismatch" between the occurrence and the damages alleged. Acuity argues that the alleged conduct of MPI may have caused bodily injury to a person, and thus damages because of bodily injury to that person, but, because MPI's alleged conduct did not cause damages because of bodily injury to the governmental entities, the entities' claims for economic damages fall outside the scope of coverage.

{¶28} We find Acuity's reliance on *Anders* misplaced. *Anders* concerned whether there was a causal connection between the conduct of the insured and the property damage. The court in *Anders* found that the conduct of the insured was not the "occurrence" and did not cause the property damage. In the present case, Acuity admits that the conduct of MPI is the "occurrence." Thus, we must examine whether there is a causal connection between MPI's alleged conduct (the occurrence) and the bodily injury. We find that there *is* arguably a causal connection between MPI's alleged conduct and the bodily injury suffered by individuals who became addicted to opioids, overdosed, or died, and the damages suffered by the governmental entities (money spent on services like emergency, medical care, and substance-abuse treatment). As stated by the MDL court, "Perhaps it can be said . . . [that] the provision of medical treatment and emergency response services arise directly out of the personal injury of the citizens because they are effectively claims to recoup the costs of medical expenses." *In re Natl. Prescription Opiate Litigation*, N.D.Ohio No. 1:17-md-2804, 2018 WL 6628898 (December 19, 2018).

{¶29} We find the Seventh Circuit's rationale in *H.D. Smith* to be persuasive, and hold that the policies potentially cover some of the claims and damages in the underlying suits, and so Acuity has a duty to defend against the underlying suits. It is not unprecedented for insurers to defend insureds against claims asserted by

governmental entities, even where the government itself did not sustain bodily injury or property damage. *See, e.g., Beretta U.S.A. Corp.,* 117 F.Supp.2d at 495 (insurer required to defend against government entities' suits to recover costs incurred providing medical care to victims of gun violence and additional funds spent on emergency services); *Kipin Industries, Inc. v. Am. Universal Ins. Co.,* 41 Ohio App.3d 228, 230-231, 535 N.E.2d 334 (1st Dist.1987) ("when the environment has been adversely affected by pollution to the extent of requiring governmental action or expenditure or both for the safety of the public, there is 'property damage' whether or not the pollution affects any tangible property owned or possessed exclusively by the government").

{¶30} The governmental entities are seeking their own economic losses, but some of those losses (such as medical expenses and treatment costs) are arguably "because of" bodily injury. Acuity has failed to show that its interpretation of the policies is "the only one that can fairly be placed on the language in question." *See Andersen,* 93 Ohio St.3d at 549, 757 N.E.2d 329. Some of the claims in the underlying suits are potentially within the policies' coverage. Therefore, the trial court erred in ruling that Acuity has no duty to defend under the "because of bodily injury" provision.

### *The Loss-in-Progress Provision*

{¶31} The trial court held that Acuity was excused from defending against the underlying suits not only under the "because of bodily injury" provision, but also under the "loss-in-progress" provision. The court reasoned that before Acuity ever insured MPI, MPI knew of the opioid epidemic, and yet continued to fill suspicious orders and fail to report those orders, further contributing to the epidemic. For the

reasons discussed below, we hold that the trial court erred in finding no duty to defend under the loss-in-progress provision.

{**¶32**} The policies provide coverage only if certain conditions are satisfied:

b. This insurance applies to bodily injury and property damage *only if:*

> (1) The bodily injury or property damage is caused by an occurrence that takes place in the coverage territory;
>
> (2) The bodily injury or property damage occurs during the policy period; and
>
> (3) Prior to the policy period, no insured * * * knew that bodily injury or property damage had occurred, in whole or in part. If insured * * * knew, prior to the policy period, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.

{**¶33**} The (b)(3) provision is at issue in this case. It is sometimes referred to as a "loss-in-progress," "known-risk," or "known-loss" provision.[3] *Hastings Mut. Ins. Co. v. Village Communities Real Estate, Inc.,* 10th Dist. Franklin No. 14AP-35, 2014-Ohio-2916, ¶ 16.

{**¶34**} First, we must decide whether the loss-in-progress provision is a prerequisite to establishing coverage or if it is an exclusion to coverage. MPI argues

---

[3] There is also a legal doctrine called the "known-loss" or "loss-in-progress" doctrine, but this doctrine, although similar, is distinct from any language in an insurance policy, has not been adopted by Ohio law, and is not at issue in this case. *See Tunnell Hill Reclamation, LLC v. Endurance Am., Specialty Ins. Co.*, S.D.Ohio No. 2:15-CV-2720, 2016 WL 3689100, *5 (July 12, 2016).

that it is an exclusion and Acuity argues that it is a prerequisite to establishing coverage. "The insured bears the burden to show that its loss was covered under the policy." *Chiquita Brands Internatl.,* 2013-Ohio-759, 988 N.E.2d 897, at ¶ 9. Therefore, if the loss-in-progress provision is a prerequisite to establishing coverage, then MPI has the burden to demonstrate that the policies provide coverage.

{¶35} Although it did not consider a loss-in-progress provision, the Ohio Supreme Court in *Physicians Ins. Co. of Ohio v. Swanson*, 58 Ohio St.3d 189, 191, 569 N.E.2d 906 (1991), distinguished between a definition and an exclusion when interpreting an insurance policy. The court found that both of the insurance policies at issue precluded coverage, but determined that they achieved preclusion in different ways. *Id.* at 908. "The difference is that one policy achieves this result by way of an express exclusion for such injuries, whereas the other policy does so by way of definition and an exclusion." *Id.* Thus, the definition and exclusion provisions in an insurance agreement function independently.

{¶36} In this case, the loss-in-progress provision, (b)(3), appears under the "Insuring Agreement" section, not the "Exclusions" section. Also, the policies apply to bodily injury "only if" the loss-in-progress provision does not apply.

{¶37} Although it did not interpret a loss-in-progress provision, in *Lightening Rod Mut. Ins. Co. v. Southworth*, 2016-Ohio-3473, 55 N.E.3d 1174, ¶ 7 (4th Dist.), the Fourth District interpreted a (b)(2) provision identical to the (b)(2) provision in the policies in the present case—"the bodily injury or property damage occurs during the policy period." Also, just like in this case, the (b)(2) provision appeared under the "Insuring Agreement" section, not the "Exclusions" section. *Id.* The court treated the (b)(2) provision as a prerequisite to coverage, not an exclusion.

It stated that "[b]ased on the plain language of the Policy, these claims do not fall within Policy coverage," and "coverage did not exist under the plain language of the policy * * *." *Id.* at ¶ 34-35.

{¶38} The plain language of the loss-in-progress provision and its location in the insurance policies lead us to conclude that it is a prerequisite to establishing coverage, not an exclusion from coverage. Therefore, the burden is on MPI to demonstrate that the loss-in-progress provision does not apply.

{¶39} The underlying suits claim that an opioid epidemic existed prior to 2010. The effective date of the insurance policies was July 26, 2010. In October 2008, the DEA issued a show-cause order to MPI alleging that MPI had failed to maintain effective controls against the diversion of opioids. *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration,* 861 F.3d 206, 213 (D.C.Cir.2017). The show-cause order alleged, inter alia, that "throughout 2007 and 2008, [MPI] . . . continued to fill orders for controlled substances from rogue Internet pharmacies and . . . failed to file suspicious order reports on such orders, in circumstances in which [it] knew or should have known that the pharmacies were operating illegally." *Masters Pharmaceuticals, Inc.; Decision and Order,* 80 Fed.Reg. 55418-01, 55422 (September 15, 2015). The DEA alleged that MPI violated the "reporting" and "shipping" requirements imposed upon it by 21 C.F.R. 1301.74 by failing to notify the DEA of suspicious orders, and then filling those suspicious orders without performing due diligence. *Masters* at 213. "Suspicious orders" are orders of unusual size, frequency, or pattern. 21 C.F.R. 1301.74(b).

{¶40} In April 2009, the DEA and MPI settled the show-cause order. *Masters* at 213. MPI did not admit to the allegations, but was required to pay

$500,000 and implement a compliance system to detect and report suspicious orders and prevent the diversion of opioids. *Id.*

{¶**41**} MPI created a suspicious order monitoring system ("SOMS") to identify orders of unusual size, frequency, or pattern. *Id.* Suspicious orders were supposed to be investigated by MPI staff. *Id.* In August 2013, the DEA issued a second show-cause order alleging that MPI had continued to fill and fail to report suspicious orders. *Id.* at 214. This time, there was no settlement, and the DEA administrator revoked MPI's registration in 2015 after finding that it had violated the reporting requirement. *Id.* at 215. The D.C. Circuit Court of Appeals determined that the registration was revoked for violations of the reporting requirement, and not the shipping requirement. *Id.*

{¶**42**} Nevertheless, it is clear from the administrator's decision that, although he based his revocation on MPI's failure to report suspicious orders, he also found that MPI had filled suspicious orders. *Masters Pharmaceuticals, Inc.; Decision and Order*, 80 Fed.Reg. at 55500.

> [T]he evidence shows that those orders were frequently released without contacting the pharmacy and obtaining an explanation for the order.
>
> * * *
>
> While the evidence shows that in numerous instances, the SOMS held an order because it resulted in the pharmacy's orders exceeding its [controlled substance limit ("CSL")] on a rolling 30-day basis, many of the orders were subsequently filled because [MPI] then counted the pharmacy's orders on a calendar-month basis. And again, [MPI] filled the orders without obtaining an explanation from the pharmacy. Whether

18

the orders were filled because they were supported by the [utilization report], or because [MPI] counted them on a calendar-month basis, this also frequently resulted in the CSL being increased even though [MPI] had entirely failed to investigate whether there was a legitimate basis for the increase in the orders. This resulted in an even greater amount of oxycodone being shipped without being held by the SOMS for review.

*Id.*

{¶43} In the present case, the underlying suits allege that MPI breached its duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opioids, and that MPI's failures were a *direct and proximate cause* of prescription opioid abuse, addiction, morbidity, and mortality resulting in increased governmental expenses such as substance-abuse treatment and emergency and medical-care services.

{¶44} MPI does not contend that it did not know about opioid addiction generally prior to July 26, 2010. Instead, it argues that its failure to report and refuse to fill suspicious orders "indicates only that MPI knew of a risk that prescription drugs it distributed wholesale could eventually be diverted into illegal channels far down the supply chain or be misused and abused by individuals." MPI contends that general awareness of the risk of addiction prior to the policy periods cannot establish the applicability of the loss-in-progress provision.

{¶45} In cases in which a loss-in-progress provision barred coverage, the claims were specific as to the damage or injury caused, the victim of the injury, and the nature of the injury. Also, coverage was only barred under the loss-in-progress provisions where the damage forming the basis of the underlying suits was a

continuation of the same damage from before the policy period. *See, e.g., Ohio Cas. Ins. Co. v. Mansfield Plumbing Prod., L.L.C.*, 5th Dist. Ashland No. 2011-COA-009, 2011-Ohio-4523, ¶ 20 (holding that the loss-in-progress provision barred coverage because the insured knew prior to purchasing the policies that the products it manufactured were defective and causing damage to third parties); *Hastings Mut. Ins. Co.,* 10th Dist. Franklin No. 14AP-35, 2014-Ohio-2916, at ¶ 21 (holding that the loss-in-progress provisions barred coverage because the property damage that was the subject of the underlying suits began prior to the policy period, continued into the policy period, and the insured knew of the damage prior to the policy period); *but see Kaady v. Mid-Continent Cas. Co.*, 790 F.3d 995, 999 (9th Cir.2015) (holding that coverage was not precluded because the property damages claimed in the underlying suit were different from the property damages which the insured was aware of prior to the policy period).

{¶46} MPI claims that it was an upstream wholesaler that "could not and did not know of injuries to [certain individuals]." It argues that there is no evidence that any particular suspicious orders resulted in diversion of opioids that caused bodily injury, much less the same bodily injuries that formed the basis of the underlying suits.

{¶47} Acuity argues that MPI was a distributor of powerfully addictive opioids and it was put on notice that (1) it was violating the law in filling and failing to report suspicious orders, and (2) these violations were contributing to an epidemic. Thus, Acuity contends, MPI did not just know of a general risk, but rather knew that its failure to maintain effective controls against diversion of opioids was a cause of the opioid epidemic.

{¶48} None of the cases cited by the parties or found by this court have examined a loss-in-progress provision in the context of an opioid epidemic resulting in damages to governmental entities as alleged in the underlying suits.

{¶49} A loss-in-progress provision is included in an insurance contract because insurance policies are only meant to cover fortuitous events, not losses that are certain to occur. *See Westfield Ins. Co. v. Custom Agri Sys., Inc.*, 133 Ohio St.3d 476, 2012-Ohio-4712, 979 N.E.2d 269, ¶ 13, citing *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 74 (Ky.2010) ("Indeed, '[t]he fortuity principle is central to the notion of what constitutes insurance * * *.' "). The awareness that there is a risk that an insured's conduct might someday result in damages is not equivalent to knowledge of the damages. *See, e.g., Buckeye Ranch, Inc. v. Northfield Ins. Co.*, 134 Ohio Misc.2d 10, 2005-Ohio-5316, 839 N.E.2d 94, ¶ 30 (C.P.) (holding that "there is no 'known risk' doctrine" and declining to apply the loss-in-progress/known-loss doctrine, which is a similar concept, but distinct from any language in an insurance policy, and has not been adopted by Ohio law); *Tunnell Hill Reclamation, LLC,* S.D. Ohio No. 2:15-CV-2720, 2016 WL 3689100, at *5; *Burlington Ins. Co. v. PMI Am., Inc.*, 862 F.Supp.2d 719, 733 (S.D.Ohio 2012).

{¶50} In this case, it is unclear at this stage in the proceedings whether some of the governmental entities' damages, such as increased costs for medical and addiction treatment, were due to diversion of MPI's products or were known to MPI prior to the policy period. We agree that MPI may have been aware there was a risk that if it filled suspicious orders, diversion of its products could contribute to the opioid epidemic, thus causing damages to the governmental entities. But, we hold

that mere knowledge of this risk is not enough to bar coverage under the loss-in-progress provision.

{¶51} Accordingly, MPI's first assignment of error is sustained.

### Second Assignment of Error

{¶52} In its second assignment of error, MPI argues that the trial court erred in determining that Acuity has no duty to indemnify MPI in future opioid settlements or judgments. MPI argues that because Acuity owes MPI a defense in the underlying suits, a decision on the duty to indemnify should be deferred until a settlement or final judgment in the underlying suits.

{¶53} The duty to defend is broader than the duty to indemnify. *Sharonville*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, at ¶ 13. Since we hold that Acuity has a duty to defend, a decision on its duty to indemnify would be premature until a final judgment in the underlying suits. *See Sherwin-Williams v. Certain Underwriters at Lloyd's London,* 813 F.Supp. 576, 591 (N.D.Ohio 1993) (where insurer owed a duty to defend, the court deferred ruling on the duty to indemnify); *Transamerica Ins. Co. v. S.A.I. Marketing Corp.,* 8th Dist. Cuyahoga No. 49256, 1985 WL 6860, *5 (June 13, 1985) (deferring ruling on the insurer's duty to indemnify because such a ruling "would be premature until the precise nature of those losses had been established"). Accordingly, MPI's second assignment of error is sustained.

### Conclusion

{¶54} MPI's assignments of error are sustained. The judgment of the trial court granting summary judgment in favor of Acuity and denying MPI's motion for summary judgment is reversed, and this cause is remanded with instructions to the

trial court to grant summary judgment in favor of MPI requiring Acuity to defend the underlying lawsuits, and for further proceedings consistent with the law and this opinion.

Judgment reversed and cause remanded.

**MYERS, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.