# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ACE AMERICAN INSURANCE COMPANY, ILLINOIS UNION INSURANCE COMPANY, ACE PROPERTY & CASUALTY COMPANY, and FEDERAL INSURANCE COMPANY | § § § § § § § | No. 339, 2020 |
| Defendants Below, Appellants, | § § § § | Court Below: Superior Court of the State of Delaware |
| v. | § § § | C.A. No. N19C-04-150 |
| RITE AID CORPORATION, RITE AID HDQTRS. CORPORATION, and RITE AID OF MARYLAND, INC. d/b/a MID-ATLANTIC CUSTOMER SUPPORT CENTER, | § § § § § § § | |
| Plaintiffs Below, Appellees. | § § § § | |

Submitted: September 22, 2021
Decided: January 10, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting this Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware: **REVERSED**.

Garrett B. Moritz, Esquire, R. Garrett Rice, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware, Marc S. Casarino, Esquire, WHITE & WILLIAMS LLP, Wilmington, Delaware, Jonathan D. Hacker, Esquire (*argued*), O'MELVENY & MYERS LLP, Washington, D.C., Michael S. Shuser, Esquire, and Blair E. Kaminsky, Esquire, HOLWELL SHUSTER & GOLDBERG LLP, New York, New York *for Defendants Below, Appellants ACE American Insurance Company, Illinois Union Insurance Company, ACE Property & Casualty Company, and Federal Insurance Company*.

Jody C. Barillare, Esquire, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware, Gerald P. Konkel, Esquire (*argued*), MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., William R. Peterson, Esquire, MORGAN, LEWIS & BOCKIUS LLP, Houston, Texas, and Christopher M. Popecki, Esquire, MORGAN, LEWIS & BOCKIUS LLP, Los Angeles, California *for Plaintiffs Below, Appellees Rite Aid Corporation, Rite Aid Hdqtrs. Corporation, and Rite Aid of Maryland, Inc.*

**SEITZ**, Chief Justice, for the Majority:

The question before us is whether insurance policies covering lawsuits "for" or "because of" personal injury require insurers to defend their insureds when the plaintiffs in the underlying suits expressly disavow claims for personal injury and seek only their own economic damages. The Superior Court decided that Rite Aid's insurance carriers were required to defend it against lawsuits filed by two Ohio counties to recover opioid-epidemic-related economic damages. As the court held, the lawsuits sought damages "for" or "because of" personal injury because there was arguably a causal connection between the counties' economic damages and the injuries to their citizens from the opioid epidemic.

We reverse. Three classes of plaintiffs are within the scope of the insured's personal injury coverage—the person injured, those recovering on behalf of the person injured, and people or organizations that directly cared for or treated the person injured. To recover under the insured's policy as a person or organization that directly cared for or treated the injured person, the plaintiff must prove the costs of caring for the individual's personal injury. Here the plaintiffs, governmental entities, sought to recover only their own economic damages, specifically disclaiming recovery for personal injury or any specific treatment damages. Thus, the carriers did not have a duty to defend Rite Aid under the governing insurance policy.

I.

A.

The appellants in this interlocutory appeal, ACE American Insurance Company, Illinois Union Insurance Company, ACE Property & Casualty Insurance Company (i/p/a ACE Property & Casualty Company), and Federal Insurance Company, are part of a group of defendants in a Superior Court insurance coverage action. Because Chubb Limited is handling the defense, we will refer to the appellants as "Chubb."[1] The appellees, Rite Aid Corporation, Rite Aid Hdqtrs. Corp., and Rite Aid of Maryland, Inc., will be referred to as "Rite Aid." Rite Aid is a national drugstore company with about 2,500 stores around the country. Chubb wrote general liability insurance for Rite Aid during the time relevant to this appeal.

Rite Aid and others are defendants in multi-district litigation before the United States District Court for the Northern District of Ohio (the "MDL Opioid Lawsuits").[2] Plaintiffs have filed over a thousand suits in the MDL Opioid Lawsuits against companies in the pharmaceutical supply chain for their roles in the national opioid crisis. Certain suits are bellwether suits—including the complaints of Summit

---

[1] *Rite Aid Corp. v. ACE Am. Ins. Co.*, 2020 WL 5640817, at *2 n.4 (Del. Super. Ct. Sept. 22, 2020).
[2] *Id.* at *2.

and Cuyahoga Counties in Ohio ("the Counties") which are at issue here. The

Counties' cases are called the "Track One Lawsuits."[3] Those lawsuits:

> take[] aim at the two primary causes of the opioid crisis: (a) a marketing scheme [by certain defendants] . . . ; and (b) a supply chain scheme, pursuant to which the various entities in the supply chain failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, thereby contributing to the oversupply of such drugs and fueling an illegal secondary market.[4]

## B.

The insurance policy at issue in this appeal is ACE Policy XSL G27390900,

which we will refer to as the 2015 Policy.[5] The 2015 Policy provides the following

coverage for personal injuries:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "property damage"

---

[3] *Id.* (citing *County of Summit, Ohio v. Purdue Pharma L.P.*, Case No. 18-OP-45090 (N.D. Ohio) (the "*Summit*" lawsuit), *County of Cuyahoga, Ohio v. Purdue Pharma L.P.*, Case No. 17-OP-45004 (N.D. Ohio) (the "*Cuyahoga*" lawsuit), and *City of Cleveland, Ohio v. Purdue Pharma L.P.*, Case No. 18-op-45132 (N.D. Ohio) (the "*Cleveland*" lawsuit)). The plaintiffs in the Track One Lawsuits amended their complaints three times and filed Amendments by Interlineation in late 2019, which were "substantively identical" but alleged new details regarding the pharmacies' "distributing and dispensing" conduct. *Id.* at *4. While the MDL District Court granted permission to amend the complaints, the Sixth Circuit reversed the decision in April 2020. *Id.* at *5. The MDL District Court then created a new litigation track for "(1) only public nuisance claims (2) against only the pharmacy defendants (3) in their roles as distributors and dispensers." *Id.* The Superior Court decided that the Third Amended Complaints ("TACs"), the operative complaints as of the date Rite Aid filed its motion (July 19, 2019), were the operative complaints for the purposes of this case. *Id.* That ruling has not been challenged on appeal. Summit's TAC is at App. to Opening Br. at A133–476 and Cuyahoga's TAC is at App. to Opening Br. at A478–878.

[4] App. to Opening Br. at A147; *id.* at A294.

[5] Chubb claimed that other policies in the litigation contain the same or similar coverage language for personal injury and that none of them cover the Track One Lawsuits. *Rite Aid*, 2020 WL 5640817, at *3. Because the Superior Court limited its decision to the 2015 Policy, we will follow its lead.

5

to which the insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "property damage" to which this insurance does not apply.

. . .

e. Damages because of "personal injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "personal injury."[6]

The 2015 Policy "applies" to "personal injury" which "is caused by an 'occurrence' that takes place in the 'coverage territory;' and . . . occurs during the policy period."[7] "Personal injury" is defined in part as "bodily injury" and includes "any continuation, change, or resumption of that 'personal injury' . . . after the end of the policy period."[8] "Bodily injury" has its own definition: "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."[9] And an occurrence, with respect to bodily injury, is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[10] Finally, the 2015 Policy provides that Chubb has a "duty to defend the insured against any 'suit' seeking [personal injury] damages."[11]

---

[6] App. to Opening Br. at A1014–28 (hereinafter, the "2015 Policy"), § I(A)(1).
[7] *Id.* at § I(A)(1)(b)(1)–(2).
[8] *Id*. at §§ III(14); I(A)(1)(c).
[9] *Id*. at § III(3). We use personal injury and bodily injury interchangeably, as do the parties.
[10] *Id*. at § III(12).
[11] *Id*. at § I(A)(1).

C.

After Chubb denied coverage, Rite Aid sued the carriers in the Superior Court, claiming breach of contract (Count I), and seeking a declaratory judgment on the duty to pay or reimburse defense costs (Count II) and statutory remedies for Chubb's refusal to defend without good cause under Pennsylvania law (Count III). Rite Aid moved for partial summary judgment on Count II, seeking a declaration that Chubb is obligated to "pay or reimburse" Rite Aid's defense costs for the Track One Lawsuits and "all similarly pled lawsuits[,]" which would likely encompass most of the MDL Opioid Lawsuits.[12] Chubb moved for partial summary judgment on the grounds that it had no obligation to defend Rite Aid in the lawsuits.[13]

On September 22, 2020, the Superior Court granted summary judgment to Rite Aid on Count II of its amended complaint. It found that Chubb had a duty to defend Rite Aid in the MDL Opioid Lawsuits. Relevant to this appeal, the court held that "some of the economic losses sought by the governmental entities are arguably because of bodily injury[,]" because the economic costs were related to injuries to individuals.[14] The court also focused on the 2015 Policy provision providing coverage for "[d]amages because of 'personal injury[,]'" which "include[s] damages claimed by any person or organization for care, loss of services

---

[12] *Rite Aid*, 2020 WL 5640817, at *1; Answering Br. at 7.
[13] *Rite Aid*, 2020 WL 5640817, at *2.
[14] *Id.* at *16.

7

or death resulting at any time from the 'personal injury.'"[15]  This language, the court found, covered the economic loss claims in the Track One Lawsuits, which were at least in part grounded in medical care for the personal injuries suffered by the Counties' residents.

We accepted Chubb's application for certification of an interlocutory appeal to review the insurance coverage issues.

## II.

Although Chubb raises several arguments on appeal, we focus on whether the policy provision covering "personal injury" applies to the claims in the Track One Lawsuits.  Chubb acknowledges that an insurer has a duty to defend the insured when a complaint seeks damages for injuries that arguably are covered by the policy. And Chubb agrees that the 2015 Policy covers suits seeking damages "for" or "because of" personal injury.  But as Chubb argues on appeal, coverage depends on whether the bodily injury was suffered by the plaintiff, or someone asserting bodily injury liability derivatively for the harmed party.  Chubb claims the Counties did not suffer personal injury and thus seek compensation only for their non-derivative economic harms, even if those harms have some causal connection to a bodily injury. While the 2015 Policy covers damages for "care" related to "the personal injury,"

---

[15] The 2015 Policy, § I(A)(1); *Rite Aid*, 2020 WL 5640817, at *15–16.

8

Chubb argues that care damages still require a showing of a personal injury suffered by an individual.

Rite Aid responds that the 2015 Policy does not exclude non-derivative economic damages related to bodily injury. If the damages sought are causally related to a covered "occurrence," it argues, the duty to defend is triggered. It also contends that the 2015 Policy covers damages suffered by an organization providing care resulting from a covered bodily injury, which should include government entities who provide medical care. Because the Track One Lawsuits allege costs for care resulting from their citizens' opioid injuries, Rite Aid contends the complaints trigger a duty to defend.

This Court reviews *de novo* the trial court's ruling on a motion for summary judgment.[16] The Court must determine "'whether the record shows that there is no genuine, material issue of fact and the moving party is entitled to judgment as a matter of law.'"[17] "We also review the Superior Court's interpretation of an insurance contract *de novo*."[18]

---

[16] *Williams v. Geier*, 671 A.2d 1368, 1375 (Del. 1996).

[17] *Id.* (quoting *Arnold v. Society for Sav. Bancorp*, 650 A.2d 1270, 1276 (Del. 1994)) (internal quotation marks omitted).

[18] *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68 (Del. 2011) (citing *Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.*, 996 A.2d 1254, 1256 (Del. 2010)).

## A.

The parties agree that Pennsylvania law controls if there is a conflict with Delaware law.[19] The Superior Court found that the state laws "do not conflict [and are not] materially different with respect to the Motions' relevant issues."[20] We agree that a choice of law analysis is unnecessary because Pennsylvania and Delaware law do not conflict on the insurance coverage issues presented here.[21]

"In construing the language of [an insurance policy,] the Court should interpret the language in the same manner as it would be understood by an objective, reasonable third party."[22] "[A] court should first seek to determine the parties' intent from the language of the insurance contract itself"[23]—the "mutual intent at the time

---

[19] Opening Br. at 10; Answering Br. at 9.

[20] *Rite Aid*, 2020 WL 5640817, at *12.

[21] *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *6 (Del. Super. Ct. Jan. 31, 2019) ("Delaware courts recognize that, where possible, a court should avoid a choice-of-law analysis altogether if the result would be the same under the law of either of the competing jurisdictions." (citations omitted)); *Valley Forge Ins. Co. v. Nat'l Union Fire Ins. Co.*, 2012 WL 1432524, at *6–9 (Del. Super. Mar. 16, 2012) (applying Delaware law to determine number of occurrences because Delaware applies "substantially the same 'cause' test" as Pennsylvania and Massachusetts); *Smith v. Liberty Mut. Ins. Co.*, 201 A.3d 555, 561 (Del. Super. Ct. 2019) (reciting Delaware's "potential" for coverage standard for duty to defend); *Nationwide Mut. Ins. Co. v. Garzone*, No. CIV.A. 07-4767, 2009 WL 2996468, at *10 (E.D. Pa. Sept. 17, 2009) (same under Pennsylvania law).

[22] *IDT Corp.*, 2019 WL 413692, at *7 (quotation marks omitted); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("Delaware adheres to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party." (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005))); *Rambo v. Greene*, 906 A.2d 1232, 1236 (Pa. Super. Ct. 2006) ("Under contract law, the objective manifestation of the parties is the governing factor regardless of subjective beliefs and reservations. An 'actual' meeting of the minds is not necessary to form a contract." (citing *Long v. Brown*, 582 A.2d 359, 363 (Pa. Super. Ct. 1990))).

[23] *Alstrin v. St. Paul Mercury Ins. Co.*, 179 F. Supp. 2d 376, 388 (D. Del. 2002); *see also Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del. 1997) ("The scope of an insurance

10

of contracting."[24]  Absent ambiguity, contract terms should be accorded their plain, ordinary meaning.[25]

Under Pennsylvania law, when there is a coverage dispute, "[t]he language of the policy and the allegations of the complaint must be construed together to determine the insurers' obligation."[26]  "[I]t is the claim which determines the insurer's duty to defend; and it is irrelevant that the insurer may get [information] from the insured, or from any one else, which indicates, or even demonstrates, that the injury is not in fact 'covered.'"[27]

The duty to defend is broad.  An "insurer has an obligation to defend its insured, even if the action against the insured is groundless, whenever the complaint . . . may potentially come within the coverage of the policy."[28]  This

---

policy's coverage . . . is prescribed by the language of the policy." (citing *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992))).

[24] *Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2018 WL 6266195, at *4 (Del. Super. Ct. Nov. 30, 2018).

[25] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012); *see also Goggin*, 2018 WL 6266195, at *4; *IDT Corp.*, 2019 WL 413692, at *7; *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) ("'When the language of the policy is clear and unambiguous, we must give effect to that language.'  However, 'when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contracts [*sic*] prime purpose of indemnification and against the insurer, as the insurer drafts the policy and controls coverage.'" (quoting *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006))).

[26] *Baumhammers*, 938 A.2d at 290; *see also Am. and Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 541 (Pa. 2010) ("The question of whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint.").

[27] *Lee v. Aetna Cas. & Sur. Co.*, 178 F.2d 750, 751 (2d Cir. 1949).

[28] *Heffernan & Co. v. Hartford Ins. Co. of Am.*, 614 A.2d 295, 298 (Pa. Super. Ct. 1992) (citing *Gedeon v. State Farm Mut. Auto. Ins. Co.*, 188 A.2d 320, 321–22 (Pa. 1963)).

applies even when the complaint has only "one allegation that falls within the scope of the policy's coverage . . . [and] even if an insured is ultimately found to be not liable."[29] Similarly, when the complaint alleges "facts which would support a recovery that is covered by the policy, it is the duty of the insurer to defend until such time as the claim is confined to a recovery that the policy does not cover."[30]

## B.

We look first to the nature of the claims in the Track One Lawsuits. The complaints are substantially similar, and often use the same language. Taking Cuyahoga County's complaint as representative, it seeks "economic damages" as a "direct and proximate result" of Rite Aid's failure to "effectively prevent diversion" and "monitor, report, and prevent suspicious orders" of opioids.[31] Cuyahoga alleges that Rite Aid's conduct also "fell far short of legal requirements" and "contributed significantly to the opioid crisis by enabling, and failing to prevent, the diversion of opioids" for illegal and non-prescription use.[32] Cuyahoga claims the opioid crisis "saddled [it] with an enormous economic burden," with "several departments

---

[29] *Garzone*, 2009 WL 2996468, at *10 (citations omitted).

[30] *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (Pa. 1987) (citing *Cadwallader*, 152 A.2d 484); *see also Gedeon,* 188 A.2d at 321–22 ("[T]he obligation to defend arises whenever the complaint filed by the injured party may *potentially* come within the coverage of the policy."); *Stidham v. Millvale Sportsmen's Club*, 618 A.2d 945, 953–54 (Pa. Super. Ct. 1993) ("If coverage (indemnification) depends upon the existence or nonexistence of undetermined facts outside the complaint, until the claim is narrowed to one patently outside the policy coverage, the insurer has a duty to defend . . . ." (citations omitted)).

[31] App. to Opening Br. at A687; *accord id.* at A339.

[32] *Id.* at A687; *accord id.* at A339.

12

[incurring] direct and specific response costs that total tens of millions of dollars[,]" including costs in the areas of medical treatment and criminal justice.[33]

Absent from the complaints, however, are personal injury damage claims for or on behalf of individuals who suffered or died from the allegedly abusive prescription dispensing practices. Rather, the Counties expressly disclaim personal injury damages to plead around the Ohio Product Liability Act.[34] The Counties made clear that:

- They "do not seek damages for death, physical injury to person, emotional distress, or physical damages to property;"[35] and

- Their increased costs "are of a different kind and degree than Ohio citizens at large" and "can only be suffered by [the Counties]" and "are not based upon or derivative of the rights of others."[36]

And as Rite Aid says in its filings in the MDL Opioid Lawsuits,

---

[33] *Id.* at A715; *accord id.* at A150 ("Defendants' conduct in promoting opioid use, addiction, abuse, overdose and death has had severe and far-reaching public health, social services, and criminal justice consequences, including the fueling of addiction and overdose from illicit drugs such as heroin. The costs are borne by Plaintiffs and other governmental entities.").

[34] *Rite Aid Corp.*, 2020 WL 5640817, at *13. Notably, "economic loss" not abrogated under the OPLA encompasses:

> All expenditures for medical care or treatment, rehabilitation services, or other care, treatment, services, products, or accommodations incurred as a result of an injury, death, or loss to person that is a subject of a tort action . . . [and a]ny other expenditures incurred as a result of an injury, death, or loss to person or property that is a subject of a tort action . . . .

Ohio Rev. Code Ann. § 2307.011(C)). The OPLA has a statute of limitations barring claims after two years of the date of the injury. *Id.* at § 2305.10. As such, the "injuries" described in the Track One Lawsuits, originating in 2015 and before, would be time-barred.

[35] App. to Opening Br. at A455; *accord id.* at A823.

[36] *Id.* at A455; *accord id.* at A822.

- The Counties claim only "indirect and purely economic injuries" that are "primarily in the form of increased social spending;"[37] and

- They "cannot recover for these [direct] expenditures because they do not constitute an 'injury' to either their 'person or property.'"[38]

The federal judge overseeing the MDL Opioid Lawsuits also observed that the Counties "do not seek recovery based on injuries to individual residents" but instead "seek recovery for direct injuries suffered by the Plaintiffs themselves."[39] And even if a recovery might "also tend to collaterally benefit their residents" that benefit "does not mean that Plaintiffs seek to litigate on behalf of those residents."[40] Thus, it is undisputed that the Counties in the MDL Opioid Lawsuits disavow personal injury claims and seek to recover only their own economic damages from Rite Aid's alleged contribution to a "public health crisis" of opioid addiction.[41]

## C.

Next, we examine the Counties' claims against Rite Aid to decide whether the Counties seek damages for or because of bodily injury under the 2015 Policy.[42] We

---

[37] Pharmacy Defendants' Objections to Magistrate Judge's Report & Recommendation Regarding Motion to Dismiss at 3, 10, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio Nov. 2, 2018), ECF No. 1078 (App. to Opening Br. at A1283; A1290).

[38] *Id.* at 10 (App. to Opening Br. at A1290).

[39] App. to Opening Br. at A1382 (emphasis omitted).

[40] *Id.*

[41] *Id.* at A496; *id.* at A150.

[42] The parties used "for" and "because of" interchangeably in the duty to defend and indemnity provision. The 2015 Policy, § I(A)(1)(a). Rite Aid contends that "because of" is broader than "for" and should be construed to mean "but for." Answering Br. at 11–12. We assume for the purposes of argument that "because of" is the standard and use it in our analysis.

14

agree with the Superior Court that the Counties' economic losses—including for "medical care"—were arguably linked to care for Ohio residents affected by the opioid epidemic. But we find that, under the 2015 Policy, damages for bodily injury are covered losses only when asserted by 1) the person injured, 2) a person recovering on behalf of the person injured, or 3) people or organizations that treated the person injured or deceased, who demonstrate the existence of and cause of the injuries. The Counties expressly disclaimed all personal injury damages in the Track One Lawsuits and, as they say, their claims are "not based on" the injuries of others.[43] Thus, Chubb has no duty to defend those suits.

i.

Obviously, the Counties cannot claim damages for bodily injury. And they seek compensation for their economic losses, not derivatively for the bodily injuries suffered by Ohioans in the opioid crisis. Nevertheless, the Superior Court held that Chubb had a duty to defend because there is a causal connection between the Counties' economic damages and the bodily injury suffered by their citizens. According to the court, the opioid-related injuries to the Counties' citizens underlie the economic injuries sought in the Track One Lawsuits.

But Pennsylvania courts have drawn a distinction when interpreting insurance policies between damages directly related to bodily injury and those that are more

---

[43] App. to Opening Br. at A455; *id.* at A822.

15

loosely connected—such as bystander suits or negligent infliction of emotional distress caused by physical injury to others.[44] For instance, in *Babalola v. Donegal Group, Inc.*, the insured sought his costs in defending a lawsuit that alleged negligence stemming from sexual assault and harassment.[45] In the underlying case, the plaintiffs claimed damages only for emotional harm even though this emotional harm arose from physical touching. The court dismissed the insurance coverage case, finding "there [were] no allegations of 'bodily injury' in the underlying lawsuit in connection with the negligence and negligent infliction of emotional distress claims for which Plaintiff [sought] coverage."[46]

We agree with the reasoning of the U.S. District Court for the Western District of Kentucky in *Cincinnati Insurance Co. v. Richie Enterprises LLC.*[47] In that case, the defendant drug distributor was sued by West Virginia for allegedly illegally

---

[44] *See Miller v. Quincy Mut. Fire Ins. Co.,* 2003 WL 23469293, at *4–5 (E.D. Pa. Dec. 4, 2003) (collecting cases and concluding that "the weight of [Pennsylvania] authority is that there must be some physical injury to the body alleged in order to constitute 'bodily injury'" for purposes of insurance policy interpretation); *Legion Indem. Co. v. Carestate Ambulance, Inc.*, 152 F. Supp. 2d 707, 718 (E.D. Pa. 2001) ("Both parties agree that to trigger coverage under an insurance policy, the plaintiff in an underlying case must allege that some physical injury resulted."); *see also Gov't Employees Ins. Co. v. Encelewski*, 1995 WL 25427, at *4 (D. Alaska Jan. 13, 1995), *aff'd,* 94 F.3d 651 (9th Cir. 1996) (finding physical manifestations of emotional distress constitute bodily injury for the purposes of an insurance provision).

[45] 2008 WL 4006721, at *4 (M.D. Pa. Aug. 26, 2008).

[46] *Id. See also United Pac. Ins. Co. v. Edgecomb*, 706 P.2d 233, 234 (Wash. Ct. App. 1985) ("the damage award for injuries to the child is combined with the damage award for the parent's anguish and grief which are derivative of and entirely dependent upon the injury to the child."); *Skroh v. Travelers Ins. Co.*, 227 So. 2d 328, 330 (Fla. Dist. Ct. App. 1969) (holding that a father's emotional injury is a direct claim, separate from injury to his son, and that his suffering does not result from the bodily injury for purposes of an insurance claim).

[47] 2014 WL 3513211 (W.D. Ky. July 16, 2014).

distributing controlled substances, supplying physicians and drugstores with drug quantities in excess of what was needed for appropriate treatment. The defendant demanded that its insurer defend under the defendant's commercial general liability policy. After the carrier refused coverage, the defendant filed suit, claiming coverage under the bodily injury policy provisions. In dismissing the case, the federal district court found:

> West Virginia is not seeking damages "because of" the citizens' bodily injury; rather, it is seeking damages because it has been required to incur costs due to [defendant's] and the other drug distribution companies' alleged distribution of drugs in excess of legitimate medical need.[48]

To recover, the government did not:

> need to prove that persons were injured by prescription drugs to prove that [the defendant] and the other drug distribution companies violated [the statute at issue]. Likewise, they need not offer such proof to show that [the defendant] and the other drug distribution companies caused a public nuisance—or to show that they were negligent in their distribution of controlled substances, causing the State of West Virginia to incur excessive costs. The Attorney General's claim that persons suffered physical harm and death due to prescription drugs only explains and supports the claims of the actual harm complained of: the economic loss to the State of West Virginia.[49]

---

[48] *Id.* at *6.

[49] *Id.* at *5; *see also Travelers Prop. Cas. Co. of Am. v. Anda, Inc.*, 90 F. Supp. 3d 1308, 1314 (S.D. Fla. 2015), *aff'd on other grounds,* 658 Fed. Appx. 955 (11th Cir. 2016) ("This Court finds the analysis in *Richie Enterprises* persuasive and also finds that the Gemini Policy does not cover the claims asserted in the Underlying Complaint because it seeks damages for the economic loss to the state of West Virginia and not 'for bodily injury.'").

The Seventh Circuit has similarly addressed this type of non-derivative economic harm in *Medmarc Casualty Insurance Co. v. Avent America, Inc.*[50] In *Medmarc*, parents sued Avent after buying Avent's baby products, alleging economic injury because they bought and did not use baby bottles made with a chemical that could be dangerous to children.[51] Applying Illinois law, the court determined that the plaintiffs had made "a serious strategic decision to pursue only this limited claim" and the complaints were "seeking only economic damages and [did] not claim any bodily injury," and, as such, the claims were not "bodily injury" claims.[52]

The Superior Court found that the "crucial distinction" between *Medmarc* and the instant case was that the parents' complaints in *Medmarc* alleged no actual injury to their children, while here, the Counties alleged that their citizens were injured by opioids.[53] But the existence of injury—untethered to the claims—does not transform the allegations into claims for damages "because of" personal injury. The complaint must do more than relate to a personal injury—it must seek to recover for the personal injury or seek damages derivative of the personal injury.

---

[50] 612 F.3d 607 (7th Cir. 2010).

[51] *Id.* at 609–10 ("at no point . . . do the plaintiffs allege that any of these negative health effects have manifested in their children. Notably, the plaintiffs never allege that they or their children ever used the products or were actually exposed to the BPA.").

[52] *Id.* at 615.

[53] *Rite Aid*, 2020 WL 5640817, at *14.

And in *Medmarc*, the Seventh Circuit analogized the facts to another insurance dispute, *Health Care Industry Liability Insurance Program v. Momence Meadows Nursing Center, Inc.*[54] In *Momence Meadows*, the complaint described the underlying bodily injuries to show why the complainants could bring a false claims action—namely, the filings the nursing home had made to Medicare and Medicaid were false because they did not mention the physical abuse the nursing home inflicted.[55] In both *Medmarc* and *Momence Meadows*, the bodily injuries served to "explain and support . . . the actual harm complained of: the economic loss" due to the defendants' misrepresentations.[56] Although a physical injury occurred, it was not the basis of the claims and therefore the damages for general economic loss were excluded from coverage.

The Superior Court also observed that Delaware and Pennsylvania law "recognize that the duty to defend test extends past the mere labels of a claim, inquiring into whether the factual allegations in the underlying complaint potentially support a covered claim."[57] We agree that carriers have a broad duty to defend that may be triggered by the factual allegations of the pleadings.[58] But the Track One

---

[54] *Id.* at 616–17 (citing *Health Care Ind. Liability Ins. Program v. Momence Meadows Nursing Center, Inc.*, 566 F.3d 689 (7th Cir. 2009)).

[55] 566 F.3d at 691, 694 (cited with approval in *Medmarc*, 612 F.3d at 617).

[56] 612 F.3d at 617 (citing *Momence Meadows*, 566 F.3d at 694).

[57] *Id.* at *15.

[58] *Erie Ins. Exch.*, 533 A.2d 1363, 1368 (Pa. 1987) (where the complaint alleges "facts which would support a recovery that is covered by the policy, it is the duty of the insurer to defend until

Lawsuits have no claims for personal injury—just facts that support the economic loss claims. "[T]he key is 'whether the allegations of the complaint, when read as a whole, assert 'a risk within the coverage of the policy.'"[59] Here, the plaintiffs do not seek damages for personal injury. They seek to recover for non-derivative economic loss.

Rite Aid points us to *Acuity v. Masters Pharmaceutical, Inc.*[60] In *Acuity*, the court held that similar complaints from the MDL Opioid Lawsuits triggered a duty to defend because "there is arguably a causal connection between [the opioid distributor's] alleged conduct and the bodily injury suffered by individuals who became addicted to opioids . . . and the damages suffered by the governmental entities (money spent on services like emergency, medical care, and substance-abuse treatment)."[61] As such, the Ohio First District Court of Appeals held the injuries claimed were arguably "because of" bodily injury.[62]

We disagree with the intermediate Ohio appellate court's reasoning in *Acuity*. The court interpreted "because of bodily injury" to mean any injuries "causally

___

such time as the claim is confined to a recovery that the policy does not cover." (citing *Cadwallader*, 152 A.2d 484)); *Gedeon,* 188 A.2d at 321–22 ("[T]he obligation to defend arises whenever the complaint filed by the injured party may *potentially* come within the coverage of the policy.").

[59] *IDT*, 2019 WL 413692, at *10 (citing *Verizon Commc'ns Inc. v. Illinois Nat'l Ins. Co.*, 2017 WL 1149118, at *6, *7 (Del. Super. Ct. Mar. 2, 2017), *rev'd and remanded sub nom. In re Verizon Ins. Coverage Appeals*, 222 A.3d 566 (Del. 2019)).

[60] 2020 WL 3446652 (Ohio Ct. App. June 24, 2020), *appeal allowed,* 159 N.E.3d 277 (Ohio 2020).

[61] *Id.* at ¶28 (emphasis omitted).

[62] *Id.* at ¶29.

related" to personal injury, and held "the policies expressly provide for a defense where organizations claim economic damages, as long as the damages occurred because of bodily injury."[63] As discussed above, that is not our reading of the personal injury terms under the 2015 Policy.[64] There must be more than some linkage between the personal injury and damages to recover "because of" personal injury: namely, bodily injury to the plaintiff, and damages sought because of that specific bodily injury. The 2015 Policy does not provide for coverage unless it is connected to the personal injury, independently proven, and shown to be caused by the insured.[65]

Rite Aid also relies on two cases that held an insurer is obligated to defend if the policy could potentially be interpreted to cover the claims in a complaint.[66] The first is *American and Foreign Insurance Co. v. Jerry's Sport Center, Inc.*[67] In *Jerry's Sport*, the National Association for the Advancement of Colored People and the National Spinal Cord Injury Association filed suit on behalf of their members against firearm wholesalers and distributors, claiming liability for injury, death, and damages because of the industry's failure to distribute firearms safely.[68] While the

---

[63] *Id.* at ¶¶ 17, 28.

[64] *See* Section II(C)–(C)(i).

[65] For the same reason we disagree with the court's reasoning in *Cincinnati Ins. Co. v. Discount Drug Mart, Inc.*, 2021-Ohio-4604 (Ohio App. Dec. 30, 2021).

[66] Answering Br. at 10–11 (first citing *Jerry's Sport*, 2 A.3d at 540–41, then citing *Erie Ins. Exch. v. Moore*, 228 A.3d 258, 265 (Pa. 2020)).

[67] 2 A.3d 526.

[68] *Id.* at 529.

plaintiffs alleged bodily injury, they did not seek damages to compensate the individual members but damages consisting of "a fund for the purpose of the education, supervision, and regulation of gun dealers."[69] The defendant's insurer provided a defense while reserving rights, and prevailed when the trial court decided the complaint did not allege bodily injury.

The carrier then filed suit against Jerry's Sport to recover its defense costs. The Pennsylvania Supreme Court found that the carrier was not entitled to recover its defense costs because an insurer could not simply reserve its rights while still providing a defense: "If [the insurer] believes there is no possibility of coverage, then it should deny its insured a defense because the insurer will never be liable for any settlement or judgment."[70] The court also held that "the duty to defend is not limited to meritorious actions; it even extends to actions that are 'groundless, false, or fraudulent' as long as there exists the possibility that the allegations implicate coverage."[71]

While the Pennsylvania Supreme Court expressed some doubt about the trial court's interpretation of the phrase "because of bodily injury," it did not address the merits of the trial court's ruling and whether economic damages could fall under

---

[69] *Id.* at 531.

[70] *Id.* at 542 (citing *Shoshone First Bank v. Pacific Employers Ins. Co.*, 2 P.3d 510, 516 (Wyo. 2000)).

[71] *Id.* at 541; *see also Transamerica*, 533 A.2d at 1368 ("If the complaint filed against the insured avers facts which would support a recovery that is covered by the policy, it is the duty of the insurer to defend until such time as the claim is confined to a recovery that the policy does not cover.").

bodily injury.[72]  Instead, *Jerry's Sport* simply confirms that an insurer cannot double back on the coverage question once it decides to provide a defense.[73]

And in the second case, *Erie Insurance v. Moore*, the Pennsylvania Supreme Court found that "the duty to defend is triggered 'if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy.'"[74]  The Court held the complaint triggered coverage under the policy provision for an "accidental injury" when it alleged an "accidental shooting" which the insurer claimed was an intentional act.[75]  Even though the facts of the complaint could support an intentional act, the court held, it was the specific language of the claim—which fell within the policy provision—that gave rise to the duty to defend.

We agree that an insurance policy is typically interpreted against the insurer when the policy is ambiguous, and there is a duty to defend when a complaint invokes coverage, even if the allegations of the complaint are in dispute.  But the requirement to defend against "groundless, false, or fraudulent" claims applies when

---

[72] Moreover, the trial court's ruling rested on the question of the type of damages sought, while acknowledging "the complaint [alleged] . . . Defendants have caused bodily injury to members of the NAACP." *Am. and Foreign Ins. Co. v. Jerry's Sports Ctr.*, 2003 WL 25884676 (Pa.Com.Pl.).

[73] *Jerry's Sport*, 2 A.3d at 540–42 ("We agree with Insured that whether a complaint raises a claim against an insured that is potentially covered is a question to be answered by the insurer in the first instance, upon receiving notice of the complaint by the insured.").

[74] 228 A.3d at 265 (quoting *Babcock & Wilcox Co. v. Am. Nuclear Insurers*, 131 A.3d 445, 456 (Pa. 2015)) (emphasis omitted).

[75] *Id.* at 266.

the facts underlying the claims are untrue or misleading—not when the claims do not, in fact, invoke coverage. If the complaint does not allege damages covered by the insurance policy, the insurer has no duty to defend.[76] The claims here are not personal injury claims and are not covered under the personal injury coverage provisions.

## ii.

Rite Aid and our colleague in dissent argue that the Track One Lawsuits "expressly seek [] damages" "claimed by an 'organization' for 'care' and 'death' resulting from 'bodily injury.'"[77] But the language of the 2015 Policy is not how they present it—the 2015 Policy covers "damages claimed by any person or organization for care, loss of services or death resulting at any time from *the* 'personal injury.'"[78] "The" personal injury means one that the person or organization claims is covered by the 2015 Policy. Here the Counties expressly disclaim injuries suffered by others and instead claim their own increased economic costs. Although some of those costs involve medical care,[79] when an organization seeks to recover its costs incurred in caring for bodily injury, it must show that it

---

[76] *Casper v. Am. Guar. & Liab. Ins. Co*, 184 A.2d 247, 249–50 (Pa. 1962).
[77] Answering Br. at 2.
[78] The 2015 Policy, § I(A)(1)(e) (emphasis added).
[79] App. to Opening Br. at A435–36; *id.* at A788.

24

treated an individual with an injury, how much that treatment cost, and that the injury was caused by the insured.[80]  That is not what the plaintiffs seek to recover here.

Instead, the Counties' claims stem from a particular action—Rite Aid's negligent distribution of opioids to the public.[81]  This claim is not directed to an individual injury but to a public health crisis.  It is analogous to a city suing an insured soda distributor for increasing its citizens' obesity rates.[82]  The city might claim costs for expanding its parks and recreational activities to address weight gain or increased public hospital expenditures for treating the population (*e.g.*, more nurses, administrative costs, a new operating center for gastric bypass surgery).  But these economic claims would not stem from any individual injury.  In other words, the city would not be bringing a personal injury claim or one for derivative loss, but rather a direct claim for its own aggregate economic injury.  Without claiming damages directly incurred in treating a specific individual's obesity, the soda distributor would not be covered under an insurance policy providing coverage to a

---

[80] *See, e.g.*, *Northland Cas. Co. v. T-N-T Ranch & Rodeo Co., LLC*, No. 11-01275-SJ-CV-DGK, 2013 WL 3212289, at *2, *5 (W.D. Mo. June 24, 2013) (where parents sued under similar "care" policy language to recover their expenses "arising out of" their daughter's injury, which had previously been covered by the policy); *Medmarc Cas. Ins. Co.*, 612 F.3d at 615 (finding the claims "lack the essential element of actual physical harm to the plaintiffs" for a bodily injury claim); *Miller,* 2003 WL 23469293, at *4–5 (finding under Pennsylvania law that without a specific underlying bodily injury in the complaint, the policy provision covering "bodily injury" was not invoked).

[81] App. to Opening Br. at A694–95.

[82] Vasanti S Malik, Matthias B. Schulze, and Frank B. Hu, *Intake of Sugar-Sweetened Beverages and Weight Gain: A Systematic Review*, 84 Am. J. Clin. Nutr. 274 (Aug. 2006), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3210834/.

"person or organization for care, loss of services or death resulting at any time from the bodily injury."[83]

The Superior Court, relying on *Cincinnati Insurance Co. v. H.D. Smith, L.L.C.,* analogized the MDL Opioid Lawsuits claims to a mother suing to recover her own costs incurred while treating her injured child:

> Based on the same policy language as in the 2015 Policy, the insurer conceded that its policy would cover a mother's cost of "care" for her son's opioid-related injuries, though those are "her own" damages. As the *H.D. Smith* court observed, under the policy language, "the result is no different merely because the plaintiff is a state, instead of a mother."[84]

But in this example, the mother must demonstrate that her child was injured by the product and that her costs were incurred because of those injuries.[85] Both claims—the mother's and the Counties'—are direct claims, asserting their own losses. They differ in that the mother's claim depends on proof of personal injury to her child. The insurer would be liable for the mother's costs under a bodily injury provision only if the harm was the immediate and direct result of her child's personal injury. Here, the County has disclaimed any recovery for personal injuries stemming from the opioid epidemic.

---

[83] The 2015 Policy, § I(A)(1).

[84] *Rite Aid*, 2020 WL 5640817, at *15 (citing *Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 773 (7th Cir. 2016)).

[85] *Medmarc*, 612 F.3d 607; *see also Wall by Lalli v. Fisher*, 565 A.2d 498, 502 (Pa. Super. 1989) ("[T]he element of physical harm or injury is a necessary element of the right of the Appellant mother to recover on her claim of negligent infliction of emotional distress in this case."); *Northland Cas. Co.*, 2013 WL 3212289, at *2.

Finally, looking to the "mutual intent at the time of contracting[,]"[86] "an objective, reasonable third party"[87] would read "damages claimed by any person or organization for care . . . or death resulting at any time from the 'personal injury'" to mean damages directly resulting from the personal injury—damages for providing care to an injured individual. If the Counties ran public hospitals and sued Rite Aid on behalf of these hospitals to recover their actual, demonstrated costs of treating bodily injuries caused by opioid overprescription, the 2015 Policy would most likely be triggered. But the Counties' alleged damages do not depend on proof of bodily injuries. Thus, the complaints are not covered by the 2015 Policy.

## III.

We reverse the Superior Court's judgment and find that Chubb does not have a duty to defend Rite Aid in the Track One lawsuits under the 2015 Policy.

---

[86] *Goggin*, 2018 WL 6266195, at *4.

[87] *IDT Corp.*, 2019 WL 413692, at *7 (citation omitted); *see also Rambo*, 906 A.2d at 1236.

VAUGHN, Justice, dissenting:

Chubb's duty to defend is "broader than its duty to indemnify"[1] damages. As the Majority notes, an "insurer has an obligation to defend its insured, even if the action against the insured is groundless, whenever the complaint . . . may potentially come within the coverage of the policy."[2] The inquiry turns on the "four corners" of the complaint in the underlying case, which must be "taken as true and liberally construed in favor of the insured."[3] As long as the complaint "'might or might not' fall within . . . coverage, the [insurer] is obliged to defend."[4] Although the Court looks to the allegations of the underlying complaint, the Court is not "limited to the plaintiff's unilateral characterization of the nature of [its] claims."[5] The Court considers "all reasonable inferences that may be drawn from the alleged facts."[6]

The policy in this case provides that Chubb will "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury[.]'"[7] It defines "[d]amages because of 'personal injury'" to include "damages

---

[1] Answering Br. at 10 (quoting *Am. and Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.,* 2 A.3d 526, 540-41 (Pa. 2010)).

[2] Maj. Op. at 11 (quoting *Gedeon v. State Farm Mut. Auto. Ins. Co.*, 188 A.2d 320, 321-22 (Pa. 1963)).

[3] Answering Br. at 10 (quoting *Jerry's Sport*, 2 A.3d at 261 n.2, 265).

[4] *Jerry's Sport*, 2 A.3d at 541.

[5] *Verizon Commc'ns Inc. v. Illinois Nat'l Ins. Co*., 2017 WL 1149118, at *6 (Del. Super. Ct. Mar. 2, 2017), *rev'd and remanded sub nom. In re Verizon Ins. Coverage Appeals*, 222 A.3d 566 (Del. 2019) (finding that the same law applies in Delaware and New York regarding the duty to defend and to advance defense expenses).

[6] *Blue Hen Mech., Inc. v. Atl. States Ins. Co*., 2011 WL 1598575, at *2 (Del. Super. Apr. 21, 2011).

[7] App. to Opening Br. at A1015, § I(A)(1).

1

claimed by any person or organization for care, loss of services or death resulting at any time from the 'personal injury.'"[8] I interpret this language broadly, as I should, to cover all damages that any organization claims against Rite Aid for the care, loss of services or death from personal injury sustained by any natural person.

In this case, the alleged personal injury is opioid addiction. The Counties assert a number of claims and a number of elements of damages, but using the Summit complaint as an example, I would find that the claims asserted against Rite Aid include claims for damages because of personal injury from opioid addiction. In paragraph 20 of the complaint, for example, following averments that discuss the extensive addiction and deaths caused by opioids, Summit avers that the defendants' "conduct in promoting opioid use, addiction, abuse, overdose and death has had severe and far-reaching public health . . . consequences, including the fueling of addiction and overdose from illicit drugs such as heroin."[9] Paragraph 20 further alleges that "[t]he costs are borne by Plaintiffs and other governmental entities."[10] Also in paragraph 20, Summit alleges that "necessary and costly responses to the opioid crisis include . . . providing addiction treatment, . . . treating opioid-addicted newborns in neonatal intensive care units, [and] burying the dead."[11]

---

[8] *Id.* at § I(A)(1)(b)(2).
[9] App. to Opening Br. at A150.
[10] *Id.*
[11] *Id.*

2

In paragraph 167, the complaint alleges that the alleged public nuisance, that is, the opioid epidemic, can be abated by several activities including "providing addiction treatment to patients who are already addicted to opioids."[12] Paragraph 168 alleges that the defendants "have the ability to act to abate the public nuisance."[13] These allegations can be construed as seeking a judgment requiring Rite Aid to pay for the cost of treating patients who are addicted to opioids.

Paragraphs 987 and 1017 allege that Rite Aid violated and/or aided and abetted violations of R.C. § 2925.02(A), which provides that "[n]o person shall knowingly . . . [b]y any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent."[14] Paragraph 1025 alleges that "[a]s a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, Plaintiffs have suffered and will continue to suffer . . . emergency, health, . . . rehabilitation, and other services."[15] Paragraph 1039 alleges that "[p]laintiffs seek all legal and equitable relief as allowed by law, including . . . restitution, . . . compensatory . . . and all damages allowed by law to be paid by the Defendants."[16]

---

[12] *Id.* at A189.
[13] *Id.*
[14] *Id*. at A447, A452.
[15] *Id.* at A454.
[16] *Id.* at A456.

3

Allegations such as these set forth, at least potentially, claims against Rite Aid for damages incurred by Summit in paying for the care of opioid-addicted persons and costs associated with their deaths. They also can be construed as seeking damages from Rite Aid to pay for projected future treatment of opioid-addicted persons. I would, therefore, find that the complaint asserts claims against Rite Aid, at least potentially, for "damages because of personal injury," as that phrase is defined in the policy, which triggers Chubb's duty to defend.

The Majority points to paragraphs 1032, 1033, and 1038 of the Summit complaint, in which the county alleges that the Plaintiffs "do not seek damages for death, physical injury to person, emotional distress, or physical damages to property, as defined under the Ohio Product Liability Act[;]" the Plaintiffs' increased costs "are of a different kind and degree than Ohio citizens at large" and "can only be suffered by [the counties]" and "are not based upon or derivative of the rights of others."[17] They also point to similar statements made in a filing by Rite Aid and other defendants objecting to a magistrate judge's report in the underlying litigation. These averments in Summit's complaint were apparently a pleading tactic made to avoid the application of Ohio's Product Liability Act, which abrogates claims for death or physical injury but does not abrogate economic loss, including expenditures for medical care or death as a result of a personal injury. The averments are also

---

[17] *Id.* at A455.

4

apparently made to try to avoid a statute of limitation contained in Ohio's Product Liability Act. The statements in the objections to the magistrate judge's report are arguments in opposition to the Counties' cases on the merits, wherein Rite Aid and others argue that the Counties can recover in tort only for direct harms. However, as far as the issue before this Court— Chubb's duty to defend—is concerned, I think that the statements in paragraphs 1032, 1033, and 1038 and the objections to the magistrate judge's report are beside the point. They do not disavow Summit's claim for damages associated with the treatment of opioid-addicted persons or their deaths.

The issue is not how Ohio's Product Liability Act defines personal injury, or how the Counties unilaterally define their claims in their complaints. The issue is whether the facts alleged in the complaint, taken as a whole, may potentially come within the coverage of the policy. It appears plain to me that the Counties intend to prove that Rite Aid, along with other drug distributors and others, caused the personal injury, that is, the alleged opioid-addiction epidemic, that is at the heart of their claims. It also seems plain that the Counties intend to seek damages for costs incurred by them for the care, loss of services or death resulting from opioid addiction. By insuring damages because of personal injury, and defining such damages to include amounts spent by any organization for the care, loss of services or death resulting from the personal injury, the policy extends coverage to what can be termed economic costs associated with that care, loss of services or death.

5

Therefore, some of the relief sought by the Counties, at least potentially, falls with the policy's coverage.

I disagree with the Majority's view that the policy covers only personal injury claims asserted by the person injured, a person recovering on behalf of the person injured, or people or organizations that treated the person injured or deceased, who demonstrate the existence and cause of the injuries. The policy does not contain such language. The policy covers damages claimed by *any* organization for the care of a person injured by Rite Aid. I think the policy language is broader than the Majority's rule.

I also think that *Cincinnati Insurance Co. v. Richie Enterprises LLC,*[18] a case from the Western District of Kentucky, is distinguishable from this case and of no real help. The underlying lawsuit in that case was one brought against Richie, a pharmaceutical drug distributor, by the Attorney General of the State of West Virginia. Richie's insurer, Cincinnati, brought a declaratory action seeking a judgment that West Virginia's suit did not fall within the coverage of the policy it had issued to Richie and it had no duty to defend. West Virginia's suit initially contained a Count VII, which was a claim for the cost of a medical monitoring program in connection with a prescription drug abuse epidemic. The court initially found that Count VII sought "damages for 'bodily injury'" that triggered the duty to

---

[18] 2014 WL 3513211 (W.D. Ky. July 16, 2014).

defend.[19]  However, West Virginia amended the complaint in the underlying action to eliminate Count VII altogether.  Cincinnati then asked the court to reconsider its decision finding a duty to defend.  Upon reconsideration, the court found that in the absence of Count VII, West Virginia did "not need to prove that persons were injured by prescription drugs to prove that Richie  and other drug distribution companies violated West Virginia's Uniformed Controlled Substances Act  or Consumer Credit and Protection Act[,]"[20] or to show that Richie and other distribution companies caused a public nuisance or were negligent in their distribution of controlled substances, "causing the State of West Virginia to incur excessive costs."[21]  The court further found that West Virginia was not "seeking damages 'because of' the citizens' bodily injury; rather, it [was] seeking damages because it [had] been required to incur costs due to Richie and the other drug distribution companies' alleged distribution of drugs in excess of legitimate medical need."[22]  In this case, however, the Counties' complaints do seek damages for the cost of the care and death of persons addicted to opioids, damages that are, at least potentially, included in the policy's definition of "damages because of personal injury."

---

[19] *Id.* at *2.
[20] *Id.* at *5.
[21] *Id.*
[22] *Id.* at *6.

*Medmarc Casualty Insurance Co. v. Avent America, Inc.*[23] is distinguishable because, in that case, no personal injuries were even alleged. As the trial judge in this case put it, "[t]he decisions in *Richie* and *Medmarc* either view the alleged facts too narrowly or do not involve claims similar to those asserted in the Track One Lawsuits."[24] *Health Care Industry Liability Insurance Program v. Momence Meadows Nursing Center, Inc.*[25] involved claims under the federal False Claims Act and the Illinois Whistleblower Reward and Protection Act. It did not involve claims for damages for personal injury.

The case that seems to be the most factually similar to this case is *Cincinnati Insurance Co. v. H.D Smith, L.L.C.*,[26] a case from the Seventh Circuit Court of Appeals. In an underlying action, the State of West Virginia brought suit against pharmaceutical drug companies, claiming that West Virginia faced an "'epidemic of prescription drug abuse' that [cost] it hundreds of millions of dollars every year"[27] and asserting a variety of claims against the companies. One of the claims, like one of the claims here, was that West Virginia had spent large sums of money "caring for drug-addicted West Virginians."[28] More specifically, the suit alleged that West Virginia incurred damages by paying for hospital services for persons addicted to

---

[23] 612 F.3d 607 (7th Cir. 2010).
[24] Appellant's Opening Br. Ex. A at 32-33.
[25] 566 F.3d 689 (7th Cir. 2009).
[26] 829 F.3d 771, 773 (7th Cir. 2016).
[27] *Id.* at 772.
[28] *Id.* at 773.

opioids, many of whom had no medical insurance coverage. The relevant language in H.D. Smith's insurance policy was substantially the same as the language involved here. It defined "damages because of bodily injury" as "damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury."[29] Cincinnati, H.D. Smith's insurer, refused to provide a defense and filed suit in federal court seeking a declaration that the policy did not cover West Virginia's suit. The federal district court ruled in favor of Cincinnati.

The Seventh Circuit Court of Appeals reversed. It distinguished *Medmarc*, previously decided by the same Court of Appeals, on the grounds that no actual personal injury was alleged in *Medmarc*. Cincinnati made essentially the same arguments in *H.D. Smith* that Chubb makes here. The Court ruled that West Virginia's claim that H.D. Smith was liable for money it spent caring for drug-addicted West Virginians was potentially within the policy coverage and Cincinnati had a duty to defend. In this case, Summit has alleged that "necessary and costly responses to the opioid crisis include . . . providing addiction treatment, treating opioid-addicted newborns in neonatal intensive care units, [and] burying the dead."[30] On the points that are relevant–the underlying claim and the policy language–*H.D.*

---

[29] *Id.*
[30] App. to Opening Br. at A150.

9

*Smith* appears to be virtually indistinguishable from this case, and the result should be the same here.

A very recently decided case out of an Ohio state appeals court, *Cincinnati Insurance Co. v. Discount Drug Mart, Inc.*,[31] is also instructive. In *Discount Drug Mart*, Summit and Cuyahoga Counties sought economic damages for Discount Drug Mart's alleged role in the opioid crisis, which the counties claimed caused "a dramatic increase in opioid abuse, addiction, overdose, and death."[32] The insurance policy in question contained language similar, yet arguably narrower, to the language in Rite Aid's policy. In that case, Cincinnati Insurance had a duty to defend when a claimant sought damages "because of 'bodily injury' or 'property damage.'"[33] Bodily injury was defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."[34] Similarly to the Counties' complaints in this case, Summit and Cuyahoga disclaimed "damages for death, physical injury to person, emotional distress, or physical damages to property, as defined under the Ohio Product Liability Act"[35] and alleged that their claims were "not based upon or derivative of the rights of others."[36]

---

[31] 2021-Ohio-4604 (Ohio App. Dec. 30, 2021).
[32] *Id.* at 4.
[33] *Id.* at 5.
[34] *Id.*
[35] *Id.* at 20.
[36] *Id.*

Unlike the Majority here, the Ohio appeals court did not give much weight to the counties' renunciation of damages related to physical injury. Rather, relying on the reasoning in *H.D. Smith*, the court held that "although the counties are expressly seeking economic damages, we find that at least part of those claimed damages are for services that the counties have arguably had to provide 'because of bodily injury.'"[37] The language involved in Rite Aid's policy is arguably broader than the language involved in *Discount Drug Mart*.

For the foregoing reasons, I would find that Rite Aid's policy provides coverage for some of the damages sought by the Counties, at least potentially, and affirm the Superior Court's ruling that Chubb has a duty to defend.[38]

---

[37] *Id.* at 25.

[38] The Majority writes that the Counties' claims do not depend on proof of underlying bodily injury. That may be true with respect to some of the Counties' claims, such as their claims that Rite Aid violated laws pertaining to the sale and distribution of opioids. But it appears to me that the Counties' claims against Rite Aid for costs associated with the treatment and death of opioid-addicted persons will involve proof of widespread bodily injury from opioid addiction to persons within their respective jurisdictions.